Sean Daly FERRIS and Nicholas
R. Guarnieri, Plaintiffs,

v.

PENNSYLVANIA FEDERATION
BROTHERHOOD OF MAINTE-
NANCE OF WAY EMPLOYEES, Jed
Dodd, Don Tredent, Chuck Burkin-
dine, Charles Hansler, Gerry Huggler,
Perry Rapier, Wayde Ames, Tom Hud-
son, Anthony Rochon, Kevin Hussey,
William Manning, Randy Caldwell,
George Davidson, Robert E. Lininger,
Joseph Crandley, and Joseph H. Love,
Defendants.

No. 99–4147.

United States District Court,
E.D. Pennsylvania.

July 20, 2001.

Michael R. Brody, Joshua P. Rubinsky, Philadelphia, PA, for Plaintiffs.

Theodore M. Lieverman, Philadelphia, PA, for Defendants.

## MEMORANDUM

DuBOIS, District Judge.

This case involves a dispute arising out of the election of the General Chairman of the Pennsylvania Federation Brotherhood of Maintenance of Way Employees ("the Federation") in 1999 and subsequent elimination of plaintiffs' positions in the Federation. Plaintiffs Sean Daly Ferris ("Ferris") and Nicholas R. Guarnieri ("Guarnieri") allege that defendants conspired with others to amend the Federation's Constitution and By–Laws to eliminate plaintiffs' Vice-Chairman positions in retaliation for plaintiffs' support of a candidate who opposed defendant Jed Dodd ("Dodd"), General Chairman of the Federation, in the 1999 Federation election. This action, alleging violations of the Labor–Management Reporting and Disclosure Act ("LMRDA"), followed.

## I. BACKGROUND

In April, 1999, Ferris was nominated for re-election to a four-year term as Vice-Chairman of the Federation for District 8; since no other member of the Federation was nominated to oppose him, he was designated for a four-year term starting September 1, 1999. Guarnieri was elected in June, 1999 for a four-year term as Vice-Chairman for District 9. On August 9, 1999, at the Convention of the Federation, the Federation Constitution and By–Laws were amended to eliminate the two Vice-Chairman positions for Districts 8 and 9. As a result, Dodd, who served as General Chairman of the Federation at all times relevant to this action, refused to install Ferris and Guarnieri to their Vice–Chairman positions. The other individual defendants were all members of the Federation's Joint Protective Board, a Federation governing body, when the incidents that gave rise to this action occurred.

Plaintiffs allege that defendants conspired to retaliate against them in violation of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq.*, for their support of Paul Dominic, a candidate who opposed Dodd in the 1999 General Chairman election.

As a result of this allegedly unlawful retaliation, plaintiffs Ferris and Guarnieri claim to have suffered a number of psychological and physical injuries. In connection with these alleged injuries, plaintiffs seek to admit the testimony of two experts, Dr. Joseph Fred Stoner ("Dr. Stoner") and psychologist Andrew C. Santora, Ed.D. ("Dr. Santora"). Defendants filed an amended motion *in limine* [1] under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (*"Daubert"*) and its progeny to exclude certain testimony, namely, (1) certain testimony by Dr. Santora; (2) any testimony by Dr. Stoner; (3) any evidence as to causation of mental or physical injuries allegedly suffered by both plaintiffs and any treatment of said injuries; and (4) any evidence as to necessity and cost of certain medical treatment. It

---

**1.** Defendants originally filed a Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 50, filed November 7, 2001). In response, plaintiffs filed a Memorandum of Law Contra Defendants' Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 54, filed November 21, 2001); defendants then filed a Reply Brief in Support of Defendants' Motion *in Limine* to Exclude

Defense [sic] Expert Witnesses (Document No. 55, filed December 8, 2000). After conducting telephone conferences with counsel on January 24, 2001 and March 6, 2001 in an effort to narrow the issues presented in the motion, the Court dismissed defendants' original motion *in limine* without prejudice and ordered defendants to file an amended motion by Order dated March 6, 2001.

is that motion that the Court addresses in this Memorandum.

Upon concluding that there were underlying factual questions as to the admissibility of Dr. Stoner's and Dr. Santora's testimony—specifically, their respective qualifications and the bases for their diagnoses and analysis—the Court held a *Daubert* hearing on June 22, 2001. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir.2000) (explaining that a *Daubert* hearing is necessary where a court can "not determine what methodology the expert used, and the reliability of the expert's conclusion could not therefore be established"); *see generally Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir. 1999) (stressing the importance of *in limine* hearings under Rule 104(a) in making the reliability determination required under Rule 702) (citing *United States v. Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985)).

The Court will first evaluate the admissibility of the proffered expert testimony under *Daubert* and the question whether a plaintiff may testify as to diagnosis and causation of mental conditions such as depression and anxiety disorder in the absence of expert testimony. The Court will then turn to the actual injury requirement under the LMRDA and examine the question whether any evidence of plaintiffs' injuries may be presented to the jury in the absence of expert medical testimony. Finally, the Court will determine the admissibility of evidence of the necessity and cost of certain medical treatment. For the following reasons, defendants' motion will be granted in part and denied in part.

## II. DISCUSSION

### A. Expert Testimony Under *Daubert*

Federal Rule of Evidence 702, as amended December 1, 2000, provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

▪ Under Rule 702, when "[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (footnotes omitted). It is well settled that the gatekeeping role established in *Daubert* under Rule 702 is not limited to scientific testimony—the *Daubert* approach applies to all cases where the "testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This approach helps to ensure the reliability of expert testimony, which "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (quoting Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991)).

▪ Under *Daubert*, the Court must engage in a two-step inquiry. "First of all, the proffered 'expert' must be qualified to express an expert opinion. . . . Secondly, the proffered expert opinion must be reli-

able." *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir.1999). With respect to this inquiry, a number of criteria to guide the courts in making reliability determinations have been identified, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to he reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir.2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir.1994)). This list is not exhaustive—the inquiry under *Daubert* should remain a flexible one. *See, e.g., Elcock*, 233 F.3d at 746 (writing that "*Kumho Tire* makes clear that this list is non-exclusive and that each factor need not be applied in every case"); *Schieber v. City of Philadelphia*, 2000 WL 1843246, at *2 (E.D.Pa. Dec. 13, 2000) ("These factors are non-exclusive and no one of the factors weighs more heavily than another; the approach to determining the admissibility of expert testimony is a flexible one.") (citing *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786).

■ As a general rule, the party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *See Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999).

**B. Testimony of Dr. Santora**

■ Plaintiff Nicholas Guarnieri plans to offer expert testimony from his psychol-

ogist, Dr. Santora, to establish that "Guarnieri's emotional and physical distress is the result of the stressors stemming from his termination from the Federation and the on-going conflict resulting from that termination." Pls.' Trial Mem. at 13.

Dr. Santora is in private practice as a psychotherapist in Canton, Ohio; he holds many degrees, including a Bachelor of Science in Nursing, a Master of Science in Education, specializing in mental health counseling, and a Doctor of Education, with a specialization in administration and counseling. Although he is not a medical doctor, defendants concede that he has the requisite credentials and expertise to give an expert opinion as to the cause of Guarnieri's alleged mental and emotional distress. Defendants argue, however, that Dr. Santora does not have the requisite qualifications and/or expertise to testify regarding (1) the causation of the physical symptoms allegedly suffered by Guarnieri, including, *inter alia*, sexual problems, fatigue and difficulty breathing; (2) the necessity of any medications prescribed to treat Guarnieri; and (3) the reasonableness of bills submitted by other medical specialists for Guarnieri's treatment.

In support of their contention that Dr. Santora is not qualified to testify regarding the causation of physical symptoms Guarnieri allegedly suffered, defendants cite a number of cases in which psychologists were precluded from testifying on medical subjects. *See, e.g., Summers v. Missouri Pacific R.R. Sys.*, 132 F.3d 599 (10th Cir.1997) (concluding that psychologist is not an expert in the fields of medicine or toxicology and thus not qualified to testify about the causal link between dementia and brain damage due to toxic exposure); *Mancuso v. Consolidated Edison Co. of NY, Inc.*, 967 F.Supp. 1437, 1456 (S.D.N.Y.1997) (holding that a clinical psychologist could testify that a child suffered

from a learning disorder but could not testify that the cause of the learning disorder was PCB as the psychologist had no expertise in the field of medicine or PCB exposure).

This case is distinguishable from the cases cited by defendants in that the physical symptoms about which Dr. Santora will offer testimony are related to Dr. Santora's psychological diagnosis. At the *Daubert* hearing, Dr. Santora testified that Guarnieri suffers from depression and anxiety disorder, basing his diagnosis on the criteria set forth in the Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition ("DSM–IV"), the leading text in the field of psychiatry/psychology. According to Dr. Santora, Guarnieri "was experiencing insomnia, loss of interest in most activities, lethargic [sic], fatigue, loss of appetite, poor concentration and memory, racing thoughts, a decrease in his libido or loss of his libido, tension, irritability, pain or tightness periodically in his chest, stomach discomfort, sweating, frequently a lump in his throat, light-headedness, sensation of choking or smothering with difficulty breathing, frequent headaches and neck pains, heart palpitations, a sense of apprehension or impending doom, sadness nearly every day, is self-critical, early awakenings, and a loss of five to eight pounds recorded during the previous three months." Hr'g Tr. at 18 (testimony of Dr. Andrew Santora, June 22, 2001). At the hearing, Dr. Santora explained that his diagnosis was based on correlating these symptoms to the diagnostic criteria set forth in the DSM–IV for major depressive episode and panic attack. *Id.* at 18–22.

Given the specialized subjects on which Dr. Santora plans to testify, the Court concludes that Dr. Santora's testimony is based on scientific knowledge that will assist the jury to understand or determine the cause and nature of Guarnieri's alleged ailments. *See Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Dr. Santora has extensive education and experience in the field of psychotherapy and mental health counseling and his diagnosis of Guarnieri is based on this experience and the leading text in his field. Accordingly, the Court determines that plaintiff has established by a preponderance of the evidence that Dr. Santora has the requisite credentials and expertise to testify as to the cause of Guarnieri's alleged physical injuries and symptoms that are related to the mental conditions for which he was treated by Dr. Santora and the causal connection between those alleged injuries and his removal from office.

In addition, the Court concludes that he is qualified to testify with respect to the necessity and appropriateness of psychotropic drugs prescribed to treat Guarnieri's alleged mental conditions. Although Dr. Santora is not currently licensed to prescribe drugs in the state of Ohio, where he is licensed to practice, he testified that under a law enacted in May 2000, someone with his education is now permitted to prescribe drugs. Hr'g Tr. at 27 (testimony of Dr. Andrew Santora, June 22, 2001). Moreover, Dr. Santora's testimony at the *Daubert* hearing demonstrated his familiarity with psychotropic medications and his extensive experience administering pharmaceuticals as a licensed nurse. *Id.* at 28–30; 34–39. With respect to certain drugs prescribed by other medical specialists, Dr. Santora demonstrated less familiarity; he testified at the hearing that certain drugs "may have" been prescribed as treatment for some of his physical symptoms, but, having not prescribed the drugs personally, he was not certain. *Id.* at 37. Accordingly, the Court concludes that Dr. Santora may testify regarding the psychotropic drugs prescribed to treat Guarnieri's alleged mental conditions and

related physical symptoms,[2] but he may not testify with respect to the necessity and appropriateness of drugs prescribed to treat other physical ailments from which Guarnieri allegedly suffered.

█ Finally, the Court turns to the question whether Dr. Santora will be permitted to testify as to the reasonableness of medical bills submitted by other medical specialists who treated Guarnieri. Plaintiff has not offered any evidence to suggest that Dr. Santora has expertise or experience in this area. In fact, in response to the only question presented on this issue at the *Daubert* hearing—the question whether Dr. Santora is familiar with the average costs of psychotropic medications in Ohio—he testified that he was not so qualified. *Id.* at 31. Accordingly, Dr. Santora will not be permitted to testify regarding the reasonableness of bills submitted by other medical professionals for treatment of Guarnieri.

## C. Testimony of Dr. Stoner

█ Plaintiff Sean Ferris seeks to offer the expert testimony of one of his treating physicians, Dr. Stoner, to establish that "Ferris has suffered from intense headaches, insomnia, depression, and sexual dysfunction and that his symptomology is causally connected to his removal from office." Pls.' Trial Mem. at 12. Defendants contend that Dr. Stoner is not qualified to testify as to these subjects as he does not have the requisite training and expertise in psychiatry and/or psychology to give an opinion regarding the causation of Ferris's alleged mental conditions and his alleged physical symptoms. Dr. Stoner's curriculum vitae and his testimony at the *Daubert* hearing establish that he has

been trained, and spent most of his career practicing, as a pathologist. He began working at the Advanced Pain Management Center in Beaver, Pennsylvania in March, 1997 and he now specializes in pain management. As explained at the hearing, pain management treatment "consists of hands-on therapy with moist heat, electrical stimulation and trigger-point injections as well as joint manipulations." Hr'g Tr. at 60 (testimony of Dr. Joseph Fred Stoner, June 22, 2001).

█ As noted *supra*, the Court must first determine whether the proffered expert is "qualified to express an expert opinion." *In re TMI Litig.*, 193 F.3d at 663. *See also Everett v. Georgia–Pacific Corp.*, 949 F.Supp. 856 (S.D.Ga.1996) ("A threshold determination in deciding whether scientific evidence is admissible is whether the individual offering the evidence is qualified as an expert in the field in which he is offering an opinion."). Although an expert's testimony is not limited to the area in which he or she has specialized, the party offering the expert must demonstrate that the expert has the necessary expertise to provide reliable evidence. *See, e.g., Burton v. Danek Medical, Inc.*, 1999 WL 118020 (E.D.Pa. Mar. 1, 1999) (concluding that neurologist is not qualified to testify about the causation of injury in a case involving spinal fusion surgery where the neurologist had no experience or training in the area of spinal surgery). If the expert testimony falls outside a witness's expertise, the court should exclude it. *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 962545, at *3 (E.D.Pa. June 28, 2000).

At the hearing, plaintiff failed to establish by a preponderance of the evidence

---

**2.** At the *Daubert* hearing, Dr. Santora stated that "The psychiatric drugs that he [Guarnieri] would—would have been receiving would have been Serzone, Celexa, Trazodone, Lora-zepam, also known as Ativan ... and Celexa, if I had not mentioned that." Hr'g Tr. at 36 (testimony of Dr. Andrew Santora, June 22, 2001).

that Dr. Stoner is qualified to testify as to the causation of the mental conditions allegedly suffered by Ferris. Aside from a course in medical school, from which Dr. Stoner graduated in March, 1984, he has been exposed to minimal training in depression and anxiety disorder—a total of three one hour programs as part of three continuing education courses. Hr'g Tr. at 74–75 (testimony of Dr. Joseph Fred Stoner, June 22, 2001).

■ Notwithstanding Dr. Stoner's apparent lack of expertise in psychiatry and/or psychology, because of the relationship between pain management, one of his medial specialities, and anxiety disorder and depression, Dr. Stoner might, under certain circumstances, be permitted to testify with respect to the symptoms of depression and anxiety disorder and whether one of his patients presented with such symptoms.[3] However, because he has no expertise in the diagnosis and treatment of depression and/or anxiety disorder, and particularly no expertise in the causes of those ailments, he will not be permitted to

testify with respect to any causal relationship between Ferris's symptoms or his diagnosis and the conduct of the defendants in this case.[4] In the absence of causal connection testimony, Dr. Stoner will not be permitted to testify at all as his testimony would not be relevant to any fact at issue in the case. *See* Fed.R.Evid. 401; *Mancuso v. Consolidated Edison Co. of NY, Inc.*, 967 F.Supp. 1437, 1457 (S.D.N.Y.1997) (concluding that if plaintiffs cannot produce a qualified expert to testify regarding the causal connection between toxic exposure and plaintiff's learning disabilities, the testimony of plaintiff's qualified expert psychologist will be excluded as irrelevant).

■ Plaintiffs argue that if Dr. Stoner is not permitted to testify as an expert witness regarding his diagnosis of Ferris's alleged mental conditions or the cause of the alleged injuries from which Ferris suffers, he should be permitted to testify as to his diagnosis and treatment of Ferris as a fact witness as Ferris's treating physician or as a lay witness under Rule 701.[5] Al-

---

**3.** At the hearing, Dr. Santora testified that there is a connection between chronic pain and depression and anxiety and that "[t]he majority of our patients [at the Advanced Pain Management Center] have associated with their painful complaints emotional disturbance in the form of depression." *See* Hr'g Tr. at 62 (testimony of Dr. Joseph Fred Stoner, June 22, 2001).

**4.** The Court notes that, even if it concluded that Dr. Stoner was qualified to testify under Rule 702, Dr. Stoner's methodology is questionable and Dr. Stoner's conclusions as to causation are therefore suspect. At his deposition, Dr. Stoner stated that his conclusions regarding the causation of Ferris's injuries were based on Miller's Law, which Dr. Stoner described as the principle that "essentially . . . I have to believe what the patient tells me, and there is no reason for me to doubt his word at any given time unless it would conflict with my medical judgment, which it does not." Dep. of J. Fred Stoner (Aug. 2, 2000) at

18–19 (Ex. 4 to Defs.' Amended Mot. *in Limine* to Exclude Pls.' Expert Witnesses). *See also id.* at 14 (discussing the nature of Dr. Stoner's method to determine a patient's subjective experience of pain). This method, or lack thereof, fails the tests for reliability set forth in the case law as discussed *supra* Part II(A). *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 745–46 (3d Cir.2000) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n. 8 (3d Cir.1994)).

**5.** In support of this proposition, plaintiffs cite *Heller v. Shaw Indus. Inc.*, 167 F.3d 146 (3d Cir.1999), in which the Third Circuit wrote:

In many cases, a treating physician whose methods and data are reliable, but whose causation conclusion is excluded as unreliable, may still have other reliable testimony to offer. In such a case, the medical expert should be permitted to testify about his examination of the plaintiff, the tests he conducted, and the diagnosis he reached, as these are all based on reliable methods.

though many courts have allowed treating physicians to so testify, the Court concludes, under the circumstances of this case, that Dr. Stoner's testimony regarding causation of Ferris's injuries would necessarily be based on his expert knowledge. Rule 701, as amended December 1, 2000, expressly prohibits lay witnesses from providing such testimony as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701. Given the complex physical and psychological injuries that Ferris allegedly suffered, the Court determines that Dr. Stoner will not be permitted to testify as a lay witness.[6] *See infra* Part II(D) (discussing the complex nature of depression and other mental conditions). Accordingly, any proffered testimony on these subjects must meet the requirements of Rule 702 and the *Daubert* line of cases.

*See generally Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir.2000) ("A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation.").

As discussed *supra*, Dr. Stoner's lack of education and experience in the fields of psychiatry and/or psychology prevent him from testifying as an expert regarding the cause of the injuries that Ferris allegedly suffered. In addition, under Rule 701, he will not be permitted to give opinion or fact testimony that is based on his specialized medical knowledge. Finally, the Court concludes that in the absence of testimony as to the cause of Ferris's alleged injury, any evidence regarding Dr. Stoner's treatment and observation of Ferris must be excluded as it is not relevant. Accordingly, Dr. Stoner's testimony will be excluded in its entirety.

The Court now turns to a related question—whether plaintiff Ferris may testify regarding diagnoses of his mental conditions, including depression, and as to causation of the complex injuries he allegedly suffered.[7]

---

*Id.* at 159 n. 8 (internal quotation and modification omitted). In this case, Dr. Stoner is the only expert offered to testify as to Ferris's alleged injuries. As discussed *supra*, he is not qualified to give testimony as to causation and his causation testimony is unreliable. As there is no other qualified expert testimony as to causation, any 'other reliable testimony' Dr. Stoner could offer—regarding his examination and treatment of Ferris—is irrelevant. *See Mancuso*, 967 F.Supp. at 1457.

6. In support of their argument that Dr. Stoner should be allowed to testify as a lay witness, plaintiffs rely on *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir.1999), in which the Tenth Circuit wrote that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment

of the party." The *Davoll* court further explained that a treating physician, even when offering lay testimony, "may state 'expert' facts to the jury in order to explain his testimony." *Id.* (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.08 (2d ed.1999)).

*Davoll* was decided prior to the recent amendment to Rule 701. In light of the amendment, the Court questions, but does not decide, whether there are still circumstances under which a treating physician could offer lay testimony pursuant to Rule 701.

7. The Court has determined that Dr. Santora may testify as to Guarnieri's alleged mental conditions and the cause of those conditions. Accordingly, Guarnieri may testify as to what he was told about the diagnosis of those conditions. However, having excluded Dr. Ston-

#### D. Testimony of Plaintiff Ferris

■ It is well settled that when "the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson ... the law requires that expert medical testimony be employed." *Redland Soccer Club, Inc. v. Department of Army of the United States,* 55 F.3d 827 (3d Cir.1995) (quoting *Gradel v. Inouye,* 491 Pa. 534, 421 A.2d 674, 679 (1980)) (internal quotation omitted) (modification in original). *See also Bushman v. Halm,* 798 F.2d 651, 659 (3d Cir.1986) ("If the question of causal relation is so esoteric that lay minds cannot form any intelligent judgment about it without expert aid an opinion from an expert may be required.").

■ In this case, the Court must determine whether depression and other mental conditions are the types of injuries about which a lay witness may testify or whether such conditions are so complex as to require expert testimony regarding diagnosis and causation. Although the Third Circuit has not yet addressed this issue, the Court of Appeals for the District of Columbia has explained that "[w]hereas testimony from lay witnesses may be sufficient to establish that an individual is 'distressed' in some fashion, it may not be sufficient to establish that an individual suffers from a particular medical condition such as alcoholism or depression which only professional medical care providers may be qualified to diagnose." *Jefferson v. MilVets Sys. Tech., Inc.,* 172 F.3d 919, 1999 WL 66027, at *1 (D.C.Cir. Jan. 26, 1999) (unpublished).[8] *See also Villalba v.*

*Consolidated Freightways Corp. of Del.,* 2000 WL 1154073, at *4–5 (N.D.Ill. Aug. 14, 2000) (holding that any causal connection between an accident involving plaintiff and a subsequent suicide attempt requires expert testimony due to the complex nature of depression). This Court agrees with the foregoing authority and concludes that Ferris will not be permitted to testify regarding any specific medical diagnosis of his mental ailments as the conditions from which he allegedly suffers—depression and anxiety disorder—are complex injuries beyond the knowledge of the average layperson. In addition, Ferris's beliefs as to how his injuries were caused may not be presented to the jury in the absence of expert testimony regarding causation, and, as stated *supra,* all such evidence has been excluded.

Having concluded that plaintiff Ferris will not be permitted to testify regarding the diagnosis of his alleged mental conditions or the cause of those conditions, the Court now turns to the questions whether a plaintiff must prove an actual injury in order to recover under the LMRDA and, if so, whether such an injury may be established in the absence of competent medical testimony.

#### E. Actual Injury Requirement Under the LMRDA

As noted *supra,* defendants seek to exclude any evidence of causation of injuries and treatment of such injuries for both defendants. In connection with this argument, defendants contend that plaintiffs

---

er's testimony in its entirety, no such competent medical testimony will be offered with respect to the diagnosis and causation of Ferris's alleged injuries. That raises a question as to whether Ferris will be permitted testify regarding any such matters.

**8.** The Court notes that unpublished opinions have no precedential value and that under Rule 28 of the Rules of Court for the Court of Appeals of the District of Columbia, unpublished opinions are, as a general rule, not to be cited in briefs submitted to that court. Nevertheless, this Court finds the opinion instructive.

must prove that plaintiffs suffered a physical injury in order to recover under the LMRDA, citing *Rodonich v. House Wreckers Union Local 95*, 817 F.2d 967 (2d Cir.1987). In *Rodonich*, the Second Circuit wrote that "[t]he qualification that claims of emotional distress be supported by a physical manifestation of injury is an appropriate safeguard against the award of excessive and speculative damages against unions...." *Rodonich* at 977. In an effort to ensure that labor unions are not subject to excessive and/or speculative damages of the kind that concerned the *Rodonich* court, defendants argue that the Court should require (1) a physical impact *and* (2) either extreme and outrageous conduct giving rise to the condition *or* competent medical testimony to support the existence of the condition alleged to have been caused by the Federation's actions.

In response, plaintiffs argue that emotional distress claims may survive under the LMRDA without proof of any actual physical injury, citing *Bradford v. Textile Workers of America*, 563 F.2d 1138 (4th Cir.1977). In *Bradford*, the Fourth Circuit concluded that a plaintiff who brought suit under the LMRDA could recover, if entitled to any recovery, for "mental suffering and humiliation." *Id.* at 1144. *Bradford*, however, represents a minority view which this Court rejects. This Court concludes that plaintiffs must demonstrate some actual injury in order to recover under the LMRDA. *See Rodonich*, 817 F.2d 967; *Bise v. International Bhd. of Elec. Workers, AFL–CIO Local 1969*, 618 F.2d 1299 (9th Cir.1979).

■ Such actual injury may be established by plaintiffs' own testimony. *See Petramale v. Local No. 17 of Laborers' Int'l Union*, 847 F.2d 1009, 1011–12 (2d Cir.1988) (reversing judgment notwithstanding the verdict in favor of defendant union in case where there was testimony that plaintiff had become moody and argumentative, and had experienced marital difficulties and trouble sleeping, but had presented no expert medical testimony and had not sought medical treatment for his distress); *Bise v. International Bhd. of Elec. Workers, AFL–CIO Local 1969*, 618 F.2d 1299 (9th Cir.1979) (upholding decision to allow question of causation to be presented to a jury in the absence of medical testimony regarding plaintiffs' injuries in a suit brought under the LMRDA); *Glover v. Ossey*, 1995 WL 374029, at *10 (N.D.Ill. June 21, 1995) (holding that "[p]laintiffs' testimony regarding loss of sleep, irritability, humiliation, and the loss of the admittedly small monetary benefits of [their union] position[s] will suffice to support an award of damages for emotional distress" under the LMRDA and that "the jury may choose to believe it or not"); *see also Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29 (3d Cir.1994) (concluding that expert medical testimony is not required to establish emotional distress damages in a suit brought pursuant to 42 U.S.C. § 1983).

■ Following the rationale set forth in *Rodonich, Petramale, Bise*, and *Glover*, the Court concludes that evidence of emotional distress, standing alone, is insufficient to support an award of damages under the LMRDA. In this case, however, there is evidence of actual injury and the Court concludes that such injury may be established by the testimony of competent experts or plaintiffs themselves; the question of causation is for the jury. *See Petramale*, 847 F.2d 1009; *Bise*, 618 F.2d 1299. With respect to establishing Guarnieri's actual injury, Dr. Santora has the requisite credentials and expertise to testify as to the physical injuries related to Guarnieri's alleged mental conditions, as discussed *supra*. In addition, both plain-

tiffs will be permitted to testify regarding their alleged symptoms and injuries, although plaintiff Ferris may only testify to a limited extent as discussed *supra* Part II(D)—he may only testify as to the nature and timing of his alleged symptoms and injuries; he will not be permitted to testify as to any particular diagnosis or the cause of his alleged injuries. Finally, as discussed *supra*, the absence of expert testimony as to diagnosis and causation does not preclude plaintiff Ferris from presenting to a jury the question of causation and whether he suffered an actual injury. *See Petramale*, 847 F.2d 1009, *Bise*, 618 F.2d at 1305; *Bolden*, 21 F.3d at 34–35. The Court is "confident that [the Court and the jury] can ensure that plaintiffs recover only for actual injury even in the absence of expert medical testimony" in this case. *Bolden*, 21 F.3d at 36.

### F.  Evidence of Plaintiffs' Medical Bills and Expenses

■ Defendants contend that any evidence of plaintiffs' medical bills and medical expenses must be excluded as those bills were covered by the Federation's medical insurance policy which does not provide for a right of subrogation under the circumstances of this case. As set forth in the policy, the requirement of subrogation—the need to reimburse the insurer—is triggered only if plaintiffs are paid by a third-party source. The Federation's medical insurance policy provides that "[i]f a covered person makes a claim

to us for medical, dental or loss of earnings benefits under this plan prior to receiving payment from a third party or its insurer, the covered person must agree, in writing, to repay us from any amount of money they receive from the third party, or its insurer." Federation Guardian Life Insurance Group Plan (Ex. 10 to Defs.' Amended Mot. *in Limine* to Exclude Pls.' Expert Witnesses). Under the terms of the policy, the employer (the Federation) and its insurer are expressly excluded from the definition of a third-party source. As such, the Court concludes that there is no right of subrogation in this case and turns to the related issue of whether the collateral source rule is applicable.

■ Defendants argue that the collateral source rule—which generally provides that a plaintiff's recovery is not to be reduced by benefits received from a third party—does not apply where a plaintiff receives the benefits from a defendant. Although this is true, as a general rule, under state law,[9] the federal law on this issue, applicable in this case, is less than clear. *See Collins v. Star Warrant Shipping Co.*, 1987 WL 31584, at *2 (E.D.Pa. Dec. 31, 1987) ("The decisional authority in our circuit on whether federal law recognizes the collateral source rule is somewhat sparse.").

In the context of Title VII and the ADEA, for example, federal courts have held that unemployment compensation and social security benefits are not to be de-

---

**9.** *See generally Feeley v. United States*, 337 F.2d 924, 927 (3d Cir.1964) (writing, under Pennsylvania state law, that "where the defendant has been the source of the payment, the damages, generally, cannot include the benefit conferred by the defendant"); *Lomax v. Nationwide Mut. Ins. Co.*, 964 F.2d 1343, 1345 (3d Cir.1992) ("The collateral source doctrine [under Delaware law] is predicated upon the theory that a tortfeasor has no interest in, and therefore no right to benefit from, monies received by the injured person from sources unconnected with the defendant. The doctrine, however, does permit the tortfeasor to obtain the advantage of payments made by himself or from a fund created by him; in such an instance the payments come, not from a collateral source, but from the defendant himself.") (quoting *Yarrington v. Thornburg*, 58 Del. 152, 155, 205 A.2d 1, 2 (1964)).

ducted from a back pay award. *See, e.g., Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77 (3d Cir.1983) (unemployment compensation and Title VII). However, workmen's compensation benefits, which are paid solely by the employer, have been deducted from a plaintiff's recovery in some cases. *See, e.g., Mason v. Association for Indep. Growth,* 817 F.Supp. 550 (E.D.Pa.1993) (declining to apply the collateral source rule to permit double recovery for injuries in suit brought under the ADEA where plaintiff had received workmen's compensation benefits that were paid for solely by plaintiff's former employer).

In applying the collateral source rule in the context of employee benefits, courts distinguish between those payments made entirely by the defendant employer and those to which the employer merely contributes a portion of the total benefit. In addition, in the context of insurance, courts distinguish between insurance benefits provided to employees by employers pursuant to contract or a collective bargaining agreement and those benefits provided as a gratuity. *See, e.g., Feeley v. United States,* 337 F.2d 924, 928 (3d Cir.1964) ("[O]ne can justify a double recovery where the original source was supplied by the plaintiff, himself, out of resources that would otherwise have been available to him for other purposes, or where the source was the result of a gift to the plaintiff, in which there is an actual or presumed donative intent with no thought given by the donor to compensate the plaintiff."); *Chenoweth v. Schaaf,* 576 F.Supp. 1556, 1558 (W.D.Pa.1984).

The record is devoid of any evidence of the details underlying the provision of medical benefits to or on behalf of plaintiffs by the Federation's insurer. Assuming, without deciding, that the collateral

source rule applies to suit brought under the LMRDA, the Court concludes that, on the present state of the record, defendants' motion to exclude any evidence of medical bills, drug bills, or any other bills for which plaintiffs were reimbursed by the Federation must be denied without prejudice.

## III. CONCLUSION

For the foregoing reasons, Defendants' Amended Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses will be granted in part and denied in part. An appropriate order follows.

### *ORDER*

**AND NOW,** this 20th day of July, 2001, upon consideration of Defendants' Amended Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 61, filed March 26, 2001), Plaintiffs' Memorandum of Law Contra Defendants' Amended Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 62, filed April 12, 2001), Reply Brief in Support of Defendants' Amended Motion *in Limine* to Exclude Defense Expert Witnesses (Document No. 63, filed April 20, 2001) and Plaintiffs' Sur–Reply Memorandum Contra Defendants' Amended Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 69, filed June 28, 2001), the Court having conducted a *Daubert* hearing with respect to the issues raised in the amended motion on June 22, 2001, for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that Defendants' Amended Motion *in Limine* to Exclude Plaintiffs' Expert Witnesses (Document No. 61) is **GRANTED IN PART** and **DENIED IN PART** and the following testimony and other evidence [1] will be **PERMITTED:**

1. The subjects that follow are not all-inclusive; they represent only the testimony and other evidence that defendants sought to exclude in their amended motion *in limine.*

1. Andrew C. Santora, psychologist, may testify regarding:
   a. the cause of the physical symptoms related to the mental conditions allegedly suffered by Nicholas R. Guarnieri;
   b. the causal connection between Nicholas R. Guarnieri's alleged injuries and his removal from office; and
   c. the necessity and appropriateness of psychotropic drugs prescribed to treat Nicholas R. Guarnieri's alleged mental conditions.
2. Plaintiffs Sean Daly Ferris and Nicholas R. Guarnieri may testify regarding the timing and nature of the physical symptoms and emotional distress they allegedly suffered.

**IT IS FURTHER ORDERED** that the following testimony and other evidence is **EXCLUDED:**

1. Any testimony or other evidence offered by Andrew C. Santora regarding the necessity and appropriateness of drugs prescribed to treat those physical symptoms and conditions not related to the alleged mental conditions of Nicholas R. Guarnieri.
2. Any evidence or testimony offered by Andrew C. Santora regarding the reasonableness of bills submitted by other medical professionals for treatment of Nicholas R. Guarnieri.
3. Any testimony by J. Fred Stoner, M.D.
4. Any testimony by Sean Daly Ferris regarding the diagnosis and/or causation of his alleged mental conditions and resulting physical symptoms.

**IT IS FURTHER ORDERED** that defendants' motion to exclude any evidence of medical bills, drug bills, or any other bills for which plaintiffs were reimbursed by the Pennsylvania Federation Brotherhood of Maintenance of Way Employees is **DENIED WITHOUT PREJUDICE** on the present state of the record.